UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| Ronald Kingsley, et al<br>Plaintiffs | : | |
| vs. | : | C.A. No. 03-208 L |
| Jeffrey Derderian, et al<br>Defendants | : | |

PLAINTIFF RONALD KINGSLEY'S MOTION IN OPPOSITION TO DEFENDANT AMERICAN FOAM CORPORATION'S MOTION TO DISMISS AND REMAND CASE TO STATE COURT

Plaintiff Ronald Kingsley submits that this Court should deny Defendant American Foam Corporation's Motion to Dismiss and Remand Case to State Court, for the following reasons, which are discussed at greater length in Plaintiff's memorandum in support of this motion:

1. **The circumstances of the Station fire satisfy the jurisdictional requirements of 28 U.S.C. section 1369(a).**

2. The "substantial majority" of all plaintiffs requirement under 28 U.S.C. section 1369(b)(1) has not been met, and therefore this Court has jurisdiction to hear this action and must not abstain.

3. Even assuming *arguendo* that a "substantial majority of all plaintiffs" are domiciled in Rhode Island, abstention is still improper because the "primary defendants" requirement (the second prong of subsection(b)(1)) has not been satisfied.

Accordingly, for the reasons stated herein and in the



24

attached memorandum, this Court has jurisdiction to hear this action and therefore should deny the defendant's motion to dismiss and/or remand the case to state court.

By their Attorneys,
RESMINI LAW OFFICES, LTD.
BY:

RONALD J. RESMINI, ESQ. #0484
155 South Main Street
Suite 400
Providence, RI 02903
DATED: July 2 , 2003
(401)751-8855

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| Ronald Kingsley, et al<br>Plaintiffs | : | |
| vs. | : | C.A. No. 03-208L |
| Jeffrey Derderian, et al<br>Defendants | : | |

PLAINTIFF RONALD KINGSLEY'S MEMORANDUM IN OPPOSITION TO DEFENDANT AMERICAN FOAM CORPORATION'S MOTION TO DISMISS AND REMAND CASE TO STATE COURT

I. Introduction

Defendant American Foam Corporation ("hereinafter "Defendant") has filed a motion positing that the lawsuits arising out of the Station fire of February 20, 2003 should be heard in Rhode Island Superior Court. Defendant has filed a parallel motion in this Court in Passa v. Derderian, C.A. No. 03-148 L. For the reasons set forth in this memorandum, Plaintiff Ronald Kingsley (hereinafter "Plaintiff") submits that this Court should dismiss said motion on the grounds that this Court has jurisdiction to hear this action pursuant to 28 U.S.C. section 1369 (the multiparty, multiform jurisdiction act).

28 U.S.C. section 1369 became law a few weeks prior to the Station fire. As a result, the act has yet to be applied by any court of federal jurisdiction. Nevertheless, a straightforward reading of the act, on its face, can only lead to the conclusion that the Station fire circumstances meet the jurisdictional requirements of

28 U.S.C. section 1369 because it was a major catastrophe involving plaintiffs and defendants of several different states, resulting in the death of 100 people and injuries to over 100 more. Although Rhode Island residents were hit hardest by the Station fire, this disaster and its consequences cannot be classified as "an essentially local disaster," as the Defendant alleges. As a result, this Court has jurisdiction to hear the matter under the provisions of 28 U.S.C. section 1369.

## II. Facts

On February 20, 2003, the Station nightclub in West Warwick, Rhode Island, burned down during a performance by "Great White," a rock and roll band. As a result of the fire, 100 people were killed and at least forty-two were injured. (Future lists may be presented to the court showing the names of more injured victims.) As the Defendant notes, fifty-nine of the dead were Rhode Island residents while forty-one others were residents of other states, primarily Massachusetts. Of the injured, twenty-five were Rhode Island residents, while seventeen were residents of other states.

The first civil actions seeking damages for the victims of the Station fire were brought in Rhode Island Superior Court. The case of *Roderigues, et al. v. Larocque, et al.*, C.A. No. PC03-1084, was the first action to be brought. Thereafter, two other actions were

brought: *Kingsley, et al. v. Derderian, et al.*, C.A. PC03-1171 and *Kinan, et al. v. DERCO, et al.*, C.A. No. PC03-2635. In addition, other suits were filed in Connecticut, in the federal courts. See Estate of Jude B. Henault et al v. American Foam Corporation et al, C.A. No. ___ (filed June 5, 2003). Another suit, *Passa, et al. v. Derderian, et al.*, C.A. No. 03-148L was filed in this Court in April 2003. On May 30, 2003, Anheuser-Busch, Inc. removed *Kingsley* and *Kinan* from Rhode Island Superior Court to this Court. *Rodrigues* and miscellaneous petitions seeking discovery remain pending in state court. The action filed in Connecticut remains in the United States District Court for the District of Connecticut.

Jurisdiction in this action is based on 28 U.S.C. section 1369. In the instant suit, the plaintiffs are all residents of Rhode Island, while the eighteen defendants are residents of various states, to wit, six are from Rhode Island, eight are from California, one is from Alabama, one is from Missouri, one is from New York, and one is from Germany.

## III. Argument

### A. This Court has jurisdiction under 28 U.S.C. section 1369 to hear the instant case.

#### 1. The circumstances of the Station fire satisfy the jurisdictional prerequisites of 28 U.S.C. section 1369(a).

The "Multiparty, multiforum jurisdiction" statute, 28 U.S.C. section 1369, was enacted by Congress on

November 2, 2002 and applies to causes of action occurring on or after January 31, 2003. This statute provides in pertinent part that:

> (a) In general. The district courts shall have original jurisdiction of any civil action involving minimal diversity between adverse parties that arises from a single accident, where at least 75 natural persons have died in the accident at a discrete location, if--
>
> (1) a defendant resides in a State and a substantial part of the accident took place in another State or other location, regardless of whether that defendant is also a resident of the State where a substantial part of the accident took place;
>
> (2) any two defendants reside in different States, regardless of whether such defendants are also residents of the same State or States; or
>
> (3) substantial parts of the accident took place in different States.
>
> (b) Limitation of jurisdiction of district courts. The district court shall abstain from hearing any civil action described in subsection (a) in which--
>
> (1) the substantial majority of all plaintiffs are citizens of a single State of which the primary defendants are also citizens; and
>
> (2) the claims asserted will be governed primarily by the laws of that State.

As noted by defense counsel, the circumstances of the Station fire meet the jurisdictional requirements of Section 1369(a) because the fire involved a single accident in which 75 or more people died, there is "minimal diversity" between plaintiffs and defendants, some of the defendants are from states other than the site of the accident, and some of the defendants are from different states. Nevertheless defense counsel argues as

a preliminary matter that section 1369 was not intended to apply to a "local" event such as the Station fire, but should be applied to different sorts of catastrophic accidents, such as airplane disasters. On its face, section 1369 makes no reference to airplane disasters. (Obviously, if the drafters wished to limit section 1369 to airplane disasters, they could have done so.) One of the proponents of the bill, William J. Hughes, as quoted by defense counsel, noted that section 1369 was intended to promote judicial fairness and efficiency in such cases where "an airplane crashes in Colorado" or where "a hotel burns in a Las Vegas fire." 137 Cong. Rec. E1923 (daily ed. May 24, 1991). Clearly, the statute was intended to apply not to any specific type of case -- fire, airplane crash, train collision -- but rather to any mass tort litigation involving multi-parties and multi-districts.

The purpose of section 1369, as noted by the drafters of the act (who are aptly quoted by defense counsel in his memorandum), is to secure just, speedy and inexpensive determination in multi-district, multi-party civil litigation arising out of a single disaster, and also to eliminate the potential for conflicting contemporaneous rulings by coordinate district and appellate courts. In this respect, section 1369 is akin to its sister statute, 28 U.S.C. section 1407, which applies to pretrial proceedings in multi-district litigation, and was designed to secure just, speedy and inexpensive determination in

multi-district civil litigation. see In Re National Student Marketing Litigation, 368 F. Supp. 1311 (Jud. Pan. Mult. Lit., 1973) (section 1407 designed to secure just, speedy and inexpensive determination); In Re New York City Municipal Secur. Litigation, 572 F.2d 49 (2nd Cir. 1978) (same); Utah v. American Pipe & Constr. Co., 316 F. Supp. 837 (D. Cal. 1970) (section 1407 designed to eliminate potential for conflicting contemporaneous rulings by coordinate disctrict and appellate court in multidistrict related civil action).

The Station fire, which involves hundreds of potential claimants from various states and already has spawned civil litigation in the federal and state courts in Rhode Island, Connecticut, and Massachusetts, is a clear example -- a textbook example -- of the type of case for which section 1369 was enacted. Clearly, it seems inarguable that the circumstances of the Station fire satisfy the requirments of section 1369(a).

2. The term "all plaintiffs" in 28U.S.C. section 1369 must mean *all persons with claims arising from the disaster;* any other interpretation would lead to abusrd and inconsistent results.

The true issue at bar is whether this Court should abstain from hearing this action pursuant to section 1369(b). Assuming *arguendo* that Rhode Island law applies to this action, this Court shall abstain under section 1369(b) only if the "substantial majority of all plaintiffs" and the "primary defendants" are both domiciled in Rhode Island. As a result of its recent

enactment, the provisions of section 1369 have yet to be tested by American courts. Furthermore, the statute itself offers no definition of the phrases "substantial majority of all plaintiffs" and "primary defendants." But an application of common sense and analogous case law reveals that the abstention provisions of section 1369(b) are inapplicable to the facts of this case.

As a preliminary matter, before proceeding further, it must be determined what "all plaintiffs" means in the context of section 1369(b). As a basic rule of statutory construction, when determining which reasonable meaning should prevail, the text should be placed in the context of the entire statutory structure. Natural Resources Defense Council, Inc. v. Muszynski, 268 F.3d 91 (2d Cir. 2001). *See* United States v. Dauray, 215 F.3d 257, 262 (2d Cir. 2000) ("statute is to be considered in all its parts when construing any one of them") (*internal quotations omitted*). While a court begins and ends its statutory interpretation with the language of the statute where that language is unambiguous, the plain meaning of the statutory language does not control if it would lead to truly absurd results. Broward Gardens Tenants Association v. United States Environmental Protection Agency, 311 F.3d 1066, 1075-76 (11th Cir. 2002). "Absurd results are to be avoided and internal inconsistencies in the statute must be dealt with." United States v. Turkette, 452 U.S. 576, 580, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981); *see also*

United States v. Dauray, 215 F.3d 257, 264 (2d Cir. 2000) ("A statute should be interpreted in a way that avoids absurd results.").

According to *Black's Law Dictionary*, a plaintiff, literally, is "a person who brings an action." Black's Law Dictionary, 5th edition, p. 1035. Thus does "all plaintiffs" in the context of section 1369(b) mean all plaintiffs before this Court *in the instant action*? If so, as defense counsel astutely observes, abstention might be required in this case,[1] but not in *Kinan*, because all named plaintiffs in the instant case are Rhode Island residents, while all plaintiffs in *Kinan* are Massachusetts residents. This is not an extraordinary situation, because any single action is commonly brought by a single victim and his or her representatives, or, occasionally, by a few victims and their representatives. If "all plaintiffs" means all plaintiffs *in any individual action*, lawyers could draft their complaints so as to choose more favorable jurisdictions for their clients in multi-district, multi-party civil litigation, thereby subverting the purpose of section 1369 and allowing some cases arising out of the disaster to be pursued in state court and other actions to be pursued in federal court(s). This interpretation of "all plaintiffs" cannot be correct, as it would promote forum-shopping and inconsistent results,

[1] This would only occur is this Court ruled that the "primary defendants" in this action were domicled in Rhode Island. See *infra* discussing "primary defendants."

thus undermining judicial efficiency and fairness in multi-district, multi-party litigation. These evils are precisely what section 1369 was enacted to prevent. This would lead to absurd results, and therefore it cannot be correct.

The next question, then, is whether "all plaintiffs" in the context of section 1369(b)(1) means the total number of plaintiffs who have filed actions as result of the disaster in this Court and other courts. To date, only a handful of the 142 or more persons injured or killed in the Station fire have filed claims in this Court and other courts. Many more persons will undoubtedly file suits in the coming days, months and years. The total number of "plaintiffs," if that term is to be interpreted literally to mean "a person who brings an action," cannot be determined until the expiration of the statute of limitations (three years from the date of the accident, pursuant to R.I. Gen. Laws section 9-1-14), when all suits have been filed, and perhaps beyond that three-year anniversary of the accident, given that such disabilities as minority, imprisonment, unsound mind and absence from the state toll the statutory period under Rhode Island law, see R.I. Gen. Laws 9-1-19. As a result, the number of "all plaintiffs," if that term means all persons who have filed an action, cannot possibly be known for many years. Such a literal interpretation of "all plaintiffs" cannot be correct because it would make timely determinations as

to subject matter jurisdiction and pre-trial discovery impossible. This interpretation would lead to absurd results and therefore cannot be correct.

Given the foregoing, only one interpretation of "all plaintiffs" is possible. Defense counsel concurs in this supposition. Specifically, "all plaintiffs" in the context of section 1369 must mean *all persons with claims arising out of the disaster*. As noted earlier, the purpose of section 1369 is to bring all cases arising out of the disaster within the federal court umbrella, so as to secure just, speedy and inexpensive determination in multidistrict civil litigation, thereby eliminating the potential for conflicting contemporaneous rulings by coordinate district, appellate, and state courts. Such purpose can be effectuated only if the phrase "all plaintiffs" is interpreted to mean *all persons with claims arising from the disaster*. Any other interpretation of the term would result in impractical, contradictory and absurd results.

**3. The "substantial majority" of all plaintiffs requirement has not been met, and therefore this Court has jurisdiction to hear this action and must not abstain.**

In the instant case, the ratio of Rhode Island plaintiffs to foreign plaintiffs must be computed in numerical terms in order to determine if a "substantial majority" exists. As noted by defense counsel, 59% of the persons killed in the Station fire were residents of Rhode Island, while 41% were residents of other states.

Likewise, of the forty-two persons listed as injured in the *Passa* complaint, 59% were from Rhode Island while 41% percent were from other states. It seems logical to assume that the percentage of derivative plaintiffs who will seek damages for loss of consortium under R.I. Gen. Laws section 9-1-41 as a result of the Station fire will mirror the percentages listed above, to wit 59% to 41%.

Plaintiff posits that a mere 59% does not constitute a "substantial majority." A "majority," of course, means more than half of a given number or group, or, in numerical terms, anything above 50%. However, section 1369 requires a "substantial majority" to be present in order for abstention to be mandatory. The dictionary defines "substantial" as "Solid; strong; firm," *see* Funk and Wagnalls Standard College Dictionary, thus requiring in this case, a "strong majority" of plaintiffs, a "solid majority," a "firm majority." As a matter of common sense, in numerical terms, 59% cannot be called a "substantial majority," as it is merely nine percentage points above a simple majority. Rather, the number of Rhode Island plaintiffs in the instant case can more properly be described as a bare majority, a slim majority, or a slight majority.

Had Congress intended for the abstention provisions to apply when a simple majority of the plaintiffs were residents of the same state as the primary defendants, the drafters would have not have added the word "substantial."

The word "substantial" cannot be dismissed or glossed over. "When engaged in the task of statutory interpretation, 'courts ... should ... attempt to give meaning to each word and phrase.'" Grunbeck v. Dime Savings Bank of New York, 74 F.3d 331, 338 (1st Cir. 1996) (citation omitted); *see also* Menuskin v. Williams, 145 F.3d 755, 768 (6th Cir. 1998) (internal quotation, citation omitted) ("Under accepted canons of statutory interpretation, [courts] must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."). In other words, the qualifier "substantial" was added for a reason and must be applied.

In numerical terms, Plaintiff posits that a "substantial majority," then, must amount to 75% of the given group, or at the very least, 66%. This numerical breakdown is supported by analogous case law.

For instance, the United States Supreme Court has ruled that, while the Constitution does not require a unanimous verdict to convict, it does require that such a verdict be supported by a "substantial majority" of jurors. In *Johnson v Louisiana*, 92 S. Ct. 1620 (1972) and *Apodaca v Oregon*, 92 S. Ct. 1628 (1972), the Supreme Court ruled that a "substantial majority" of jurors means nothing less than a 75% minimum of jurors to insure guilt

beyond a reasonable doubt. "With regard to the substantial majority requirement, there is an interplay between the number of jurors and the percentage needed to convict." United States v. Derobertis, 715 F.2d 1174, 1179 (7th Cir. 1983). A vote of nine to convict out of a jury of twelve is constitutionally sufficient to support a guilty verdict, according to *Johnson v. Louisiana*, 406 U.S. 356, 363, 32 L. Ed. 2d 152, 92 S. Ct. 1620 (1972), while the verdict of a jury of six must be unanimous, according to *Burch v. Louisiana*, 441 U.S. 130, 138, 60 L. Ed. 2d 96, 99 S. Ct. 1623 (1979). "It is not yet clear whether a percentage vote of less than three quarters of a twelve person jury would pass constitutional muster, but it does appear that something more than a *mere majority vote* is necessary to assure the reliability of the verdict." Derobertis, *supra*, at 1179 (emphasis added), *citing* Brown v. Louisiana, 447 U.S. 323, 330-334, 65 L. Ed. 2d 159, 100 S. Ct. 2214 (1980) (plurality opinion) (discussing size and percentage votes as they relate to function of jury). "Thus, depending on the size of the jury provided by the state, a defendant's right ranges from a unanimous verdict to some as yet undelimited greater-than-simple-majority verdict." Derobertis, *supra*, at 1179.

In a military justice case, *United States v. Murray*, 48 C.M.R. 331 (1973), the court ruled that, "in our view two-thirds of the members of a court-martial constitutes a

substantial majority of such court-martial." In *Murray*, the appellant grounded his claim on the due process clause of the Fifth Amendment of the Constitution and argued that the instructions by the military judge, requiring that two-thirds of the members of four out of six must be convinced beyond a reasonable doubt of the accused's guilt of each and every element of the offense for conviction, did not constitute a "substantial majority." The court rejected this argument, ruling that two-thirds of the members of the court-martial (or 66.6%) constituted a "substantial majority" and that the conviction therefore did not violate constitutional standards. Id.

Based on the foregoing case law, the phrase "substantial majority" has been interpreted in numerical terms to mean 75% of a given group, or at the very least, 66%. In the instant case, 59% percent of "all plaintiffs" are domiciled in the State of Rhode Island. This percentage does not constitute a "substantial majority" under analogous case law, and therefore the requirements of section 1369(b) have not been met. Therefore, the abstention provisions of section 1369(b) do not apply.

**4. Even assuming *arguendo* that a "substantial majority of all plaintiffs" are domiciled in Rhode Island, abstention is still improper because the "primary defendants" requirement has not been satisfied.**

Even assuming *arguendo* that the "substantial majority" of all plaintiffs are domiciled in Rhode Island, the defendant's motion still must fail because defense

counsel has not shown that the "primary defendants" are also domiciled in Rhode Island, as required by section 1369(b)(1).[2]

The term "primary defendants" is not defined by *Black's Law Dictionary*, nor does the act provide any guidance as to what might be a "secondary defendant." A few courts scattered throughout the country have used the term "primary defendant" in various situations with different meanings, but there appears to be no universally accepted definition of the term as it relates to the discipline of law.

For instance, the Supreme Court of Rhode Island has used the term "primary defendant" merely to distinguish such a defendant from a third-party defendant. *See* Pettella v. Corp Brothers, Inc., 107 R.I. 599, 268 A.2d 699 (1970) ("decision was for the plaintiff against Corp

---

[2]1. The same problem with the term "all plaintiffs," as discussed in subsection (2) of the instant memorandum, arises when interpreting the term "defendants" under section 1369(b). Does the term "defendants" in section 1369(b)(1) mean the defendants *named in the instant action*, or the defendants *named in all lawsuits filed as of this date* (including the instant suit), or *all possible defendants who may be sued in connection with the disaster*? For the same reasons cited in the prior section of this memorandum, the only possible interpretation that would avoid absurd and inconsistent results is that the term "defendants" in this context mean *all possible defendants who may be drawn into the disaster* for one reason or another, and not the particular named defendants in this suit or other lawsuits presently under consideration. Defense counsel concurs in this assessment. Plaintiff notes, however, that the problem of creative drafting of complaints and forum-shopping is not as prevalent in the case of naming "defendants" because such parties are often integral to the action and cannot be omitted if recovery is to be had.

Brothers, Incorporated, hereinafter referred to as the primary defendant, as defendant and for the third-party plaintiff against Union Carbide as third-party defendant ... Both the primary defendant and the third-party defendant are now in this court prosecuting appeals from those judgments.").

The closest correlation to the concept of "primary defendants" and "secondary defendants," however, arises in the law of torts, specifically, under the doctrine of indemnity, as defense counsel also points out in his memorandum. For instance, an Ohio court has used the terms "primary" and "secondary" defendants to delineate the doctrine of indemnity, which recognizes a primary and secondary liability among tort defendants. Specifically, in Maryland Casualty Co. v. Frederick Co., 142 Ohio St. 605, 53 N.E.2d 795 (1944), the Supreme Court of Ohio held that, when a case is tried on the theory that liability for a plaintiff's injuries is primary as to one defendant and secondary as to the other and the "secondary defendant" is held liable to the plaintiff, that secondary defendant may recover by way of indemnity from the "primary defendant" if the primary defendant has been notififed of the claim, tendered a defense and advised that it will be required to hold the secondary defendant harmless.

This concept of primary and secondary liability among defendants has also been recognized in Rhode Island,

although the terms "primary defendant" and "secondary defendant" are not used. Under Rhode Island law, indemnity allows a party who has been held legally responsible for plaintiff's harm to shift the entire loss to another party. See Hawkins v. Gadoury, 713 A.2d 799, 803 (R.I. 1998) (indemnity is founded upon equitable considerations arising "where one person is exposed to liability by the wrongful act of another in which he does not join" such that the indemnitor will be "liable for the whole outlay and not just a pro rata share"). Thus a person "who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct." Silva v. Home Indemnity Co., 416 A.2d 664, 666 (R.I. 1980) (quoting *Restatement of Restitution*). See also Muldowney v. Weatherking Products, Inc., 509 A.2d 441, 443 (R.I. 1986) ("[i]f another person has been compelled to pay damages that should have been paid by the wrongdoer, the latter becomes liable to the former").

Traditionally, and most commonly, the right to indemnity arises from a contract, express or implied, between the parties. *See, e.g.*, Whitmarsh v. Durastone Co., 122 F. Supp. 806 (D.R.I. 1954); Silva, *supra*, at 666; Helgerson v. Mammoth Mart, Inc., 114 R.I. 438, 355 A.2d 339 (1975). The right of indemnification may also be

mandated by statute. *See, e.g.*, R.I. Gen. Laws section 31-5.1-9 (automobile manufacturer must indemnify its franchised new car dealers for damages paid as a result of defective or negligent manufacture, design, or assembly of new car).

In addition, "modern law indicates a trend to allow indemnity on the basis of equity, for example, where one person is exposed to liability by the wrongful act of another in which he does not join." Silva, *supra*, at 666. For example, *Silva* recognized that "a right of indemnity may arise between master and servant, when the servant's negligent conduct has caused the master to become liable to a third party." Id. Rhode Island has long recognized that an agent or an employee is liable to principal or employer for negligent acts that caused damage to the principal or employer, whether such damage is direct or brought about by compensation the principal or employer has been obligated to make to third parties for injuries caused by such negligent acts. Id. See Morgan v. Lucaski, 581 A.2d 714 (R.I. 1990) (employer may recover full indemnification from employee for employee's negligence).

Dean Prosser recognizes that this right of equitable indemnity most commonly applies to the following common situations "to prevent a result which is regarded as unjust or unsatisfactory": where an employer is vicariously liable for the torts of a servant or an

independent contractor; where the owner of an automobile is held liable for the conduct of the driver; where a common carrier is held liable for the acts of another; where a municipality or landowner, held liable for unsafe condition of property, sues the wrongdoer who created the hazard; and where a party, held liable for "passive" negligence, sues another party for his or her "active" negligence. W. Prosser and W. Keeton, On the Law of Torts, section 51 (5th ed. 1984) (discussing indemnity)).

Rhode Island has noted that equitable indemnification may arise in favor of one joint tortfeasor against another joint tortfeasor who is "the active and primary cause of the plaintiff's injury." Helgerson v. Mammoth Mart, Inc., 114 R.I. 438, 442, 355 A.2d 339, 341 (1975). In a later decision, *Muldowney v. Weatherking Products, Inc.*, *supra*, the court stressed that "[i]ndemnity can only be obtained when the liability of the claimant is solely constructive or derivative and only when the prospective indemnitor's wrongful acts have caused such liability to be imposed." Id. at 444.

In Muldowney, the Court considered whether a corporate successor to a manufacturer of a defective swimming pool should have the right of indemnification against one of its corporate predecessors. As a general rule of indemnification, the Court stated that:

> [i]n order to successfully assert an action for indemnity, the prospective indemnitee must prove three elements. First, the party seeking indemnity must be liable to a third party. Second, the

> prospective indemnitor must also be liable to the third party. Third, as between the prospective indemnitee and indemnitor, the obligation ought to be discharged by the indemnitor. Id. at 443.

On the facts, Muldowney noted that "the third requirement has not been met [because the corporate predecessor] neither manufactured nor placed the diving board in the stream of commerce." Id. Because "the prospective indemnitor is no more responsible for the injury than the indemnitee," Muldowney held the purpose of indemnity "would not be served by permitting recovery." Id.

Applying these concepts to the instant case, it seems clear that Defendant has failed to argue or prove any typical model of "primary" and "secondary" liability between the defendants, such as a right to indemnity arising from a contract (express or implied) between the defendants, or a right of indemnification mandated by statute, or a right of indemnity arising out of an employer-employee relationship.

Also, as to equitable indemnity, Defendant fails to show why, as between the prospective indemnitees and indemnitors, the obligation ought to be discharged by the indemnitors. Defense counsel's argument that three Rhode Island defendants -- Jeffrey Derderian, Michael Derderian, and DERCO d/b/a The Station -- are the "primary defendants" is self-serving and inconsistent with the case law regarding primary and secondary liability. For instance, under Dean Prosser's model, cited above, the concept of primary and secondary liability may apply when

a landowner, held liable for unsafe condition of property, sues the wrongdoer who created the hazard. In the instant circumstances, one could posit that Great White and its members and management, who were arguably responsible for the ignition of the pyrotechnics inside the Station, "created the hazard" on the premises, as one could also argue that American Foam Products and other named defendants, as the manufacturers and distributer of the non-fire-retardant foam, created the hazard. While it is true that a landowner has the duty to maintain his or her premises in a reasonably safe condition, it is also true that manufacturers and distributors of defective products may be held strictly liable for the harm caused by their products and that governmental employees and entities may be held liable for their egregious conduct, such as in failing to conduct proper fire inspections. Thus, rather than being primarily liable for the harm, Plaintiff posits that the three Rhode Island defendants -- Jeffrey Derderian, Michael Derderian, and DERCO d/b/a The Station -- are joint tortfeasors, jointly and severally liable for the harm, along with the other named defendants.

Joint and several liability between defendants is the norm in Rhode Island, as in other states. Equitable indemnity, or an allocation of "primary" and "secondary" liability among defendants, is rarely seen, rarely asserted, and rarely found in Rhode Island cases. It is the exception rather than the norm. In fact, there are

only a handful of cases in Rhode Island addressing this issue, as opposed to the many, many reported cases finding joint and several liability among defendants.

Rather than an example of primary and secondary responsibility, the Station night club disaster is a textbook example of joint tortious conduct resulting in horrific harm. Under the Rhode Island Joint Tortfeasor Act, R.I. Gen. Laws sections 10-6-1 to 10-6-11 (which is based on the "Uniform Contribution Among Tortfeasors Act," and is applicable in nearly every state with certain variations), the term "joint tortfeasors" means "two (2) or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." R.I. Gen. Laws section 10-6-2. See Cooney v. Molis, 640 A.2d 527, 528 (R.I. 1994) (parties are joint tortfeasors under Act when they are both allegedly in tort for same injury to plaintiff).

Each joint tortfeasor is liable for the entire harm suffered by the plaintiff, and the plaintiff may bring an action against one or all of the joint tortfeasors to obtain full recovery. See Sousa v. Casey, 111 R.I. 623, 637, 306 A.2d 186, 195 (1973) ("where two or more defendants are found liable, their liability is joint and several and the suit may be maintained against one or any of them").

Parties are jointly and severally liable "if they are

both the legal cause of harm that cannot be apportioned, whether conduct is concurring or successive." McInnis v. A. M. F., Inc., 765 F.2d 240, 250 (1st Cir. 1985). To be jointly liable in tort the parties must be responsible for the same injury. Wilson v. Krasnoff, 560 A.2d 335 (R.I. 1989). See Lawrence v. Pokraka, 606 A.2d 987 (R.I. 1992) (there are two requirements to be classified as joint tortfeasors under section 10-6-2: parties must be liable in tort and liable for same injuries).

For instance, *McInnis*, the First Circuit, applying Rhode Island law, ruled that, in action arising out of injuries sustained in a highway collision, the negligent driver and the manufacturer of a defectively-designed motorcycle qualified as joint tortfeasors. Id. *See also* Turcotte v. Ford Motor Co., 494 F.2d 173 (1st Cir. 1974) (applying Rhode Island law) (in action arising out of injuries sustained in highway collision, negligent driver and manufacturer of defectively-designed car qualified as joint tortfeasors). Likewise, the First Circuit, in *Day v. Wynne*, 702 F.2d 10 (1st Cir. 1983), applying Rhode Island law, ruled that, where a plaintiff suffered a fractured leg in an automobile accident and a physician's negligence aggravated that injury, both the driver and the physician were deemed "joint tortfeasors" under section 10-6-2.

To consider whether the tortfeasors engaged in common wrongs, the court will consider the time of the allegedly

tortious conduct and each party's opportunity to guard against the other tortfeasor's negligence. *Krasnoff*, supra. For example, an intoxicated driver who causes an automobile accident and the person who served him alcohol are joint tortfeasors under section 10-6-2. Lawrence v. Pokraka, 606 A.2d 987 (R.I. 1992).

Like the joint tortfeasor cases discussed above, the Station night club disaster was proximately caused by a concurrence of negligence by separate defendants, all whom are responsible for the same harm. The negligent acts or omissions of each "class" of defendants named in this lawsuit -- the owners and operators of the premises, the promoters of the event, the manufacturers and distributors of the defective foam, the igniters of the fire, etc. -- cannot be apportioned between the wrongdoers. In other words, "but for" each defendant's acts or omissions, the harm would not have occurred or would not have resulted in such aggravation of injury. For instance, but for the negligent promotion of the event by certain defendants, the Station night club would not have been overcrowded on the night of the disaster, resulting in hopelessly clogged exits and horrific loss of life. Likewise, but for the negligence of the owners and operators of the Station, the premises would not have been in dangerous condition. Likewise, but for the negligent omissions of various town and state officials, the fire hazards would not have existed. And clearly, but for the defective product

manufactured and distributed by American Foam Products and other defendants, the fire would not have accelerated so rapidly that the night club became an inferno filled with black toxic smoke in a matter of seconds; a simple wood fire would never have spread so quickly and probably could have been easily extinguished without harm.

In sum, a lamentable concurrence of negligence on the part of all defendants caused this terrible disaster. Indemnity, as defined by Rhode Island law, is not applicable because defense counsel has failed to show that, as between any of these defendants, any one party is more responsible for the injury than any other. Rather, the many defendants are simply joint tortfeasors, severally and jointly liable for the harm according to Rhode Island law. There is no "primary" and "secondary" among the named defendants.

As for the domiciles of the parties, a portion of "all plaintiffs" are from Rhode Island, while the defendants are residents of various states. Since the primary defendants in this case are residents of a variety of states, Plaintiff contends therefore that the second prong of section 1369(b)(1) has not been met, and this Court has jurisdiction to hear this action.

IV. Conclusion

For the reasons stated herein, this Court has jurisdiction to hear this action and therefore should deny

the defendant's motion to dismiss and/or remand the case to state court.

By their Attorneys,
RESMINI LAW OFFICES, LTD.
BY:

RONALD J. RESMINI, ESQ. #0484
155 South Main Street
Suite 400
Providence, RI 02903
DATED: July 21, 2003
(401)751-8855

CERTIFICATION

I hereby certify that on this 21st day of July, 2003, I mailed a copy of the within Motion by reular mail, postage prepaid to the following:

Thomas C. Angelone, Esq.
HODOSH, SPINELLA & ANGELONE, PC
One Turks Head Place
Providence, RI 02903

Anthony F. DeMarco, Esq.
Reynolds, DeMarco, & Boland, Ltd.
170 Westminster Street, Suite 200
Providence, RI 02903

James R. Lee, Esq.
State of Rhode Island
Department of Attorney General
150 South Main Street
Providence, RI 02903

Joseph V. Cavanagh, Jr., Esq.
Kristin E. Rodgers, Esq.
Blish & Cavanagh, LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

William P. Robinson, III, Esq.
Stephen M. Prignan, Esq.
Stephen J. MacGillivrary, Esq.
Edwards & Angell, LLP
2800 Financial Plaza
Providence, RI 02903

Marc DeSisto, Esq.
DeSisto Law Offices
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563

Daniel P. McKiernan, Esq.
146 Westminster Street
Providence, RI 02903

Mark T. Nugent, Esq.
Paul Sullivan, Esq.
Morrison, Mahoney & Miller
One Providence Washington Plaza
Providence, RI 02903

Ann S. Sheeley, Esq.
Stephen Born, Esq.
Laww Offices of Donald E. Green, P.C.
2235 Washington Street
Roxbury, MA 02119

Stefanie DiMaio Larivee, Esq.
215 Broadway
Providence, RI 02903

Howard A. Merten, Esq.
Eric M. Sommers, Esq.
VETTER & WHITE
20 Washington Place
Providence, RI 02903

James T. Murphy, Esq.
Kelly N. Michels, Esq.
HANSON CURRAN LLP
146 Westminster Street
Providence, RI 02903